No. 36,342

THE STATE OF KANSAS, *Appellee*, v. BILL VINYARD, *Appellant*.

(159 P. 2d 493)

Opinion filed June 9, 1945.

*Ray C. Sloan* and *W. H. Clark*, both of Hoxie, were on the briefs for the appellant.

*A. B. Mitchell*, attorney general, *Leon W. Lundblade*, assistant attorney general, and *J. H. Jenson*, county attorney, were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: Bill Vinyard and Ray Herschberger were duly charged jointly with the larceny of two coming-two-year-old white-faced steers branded with the letter "O" on the left shoulder and the letters "R O" on the left hip, the property of Fred Surratt and Carroll Purvine. The separate jury trial of Vinyard resulted in a verdict of guilty, on which sentence was pronounced. He has appealed and contends that he was not tried by an impartial and unprejudiced jury and that the court erred, (1) in permitting statements of an attorney to be made in the hearing of the jury panel; (2) in ordering defendant arraigned in the absence of his attorney and refusing to grant a continuance; (3) in failing to instruct on unrelated crimes; (4) in the giving of certain instructions; (5) in refusing to give a requested instruction; (6) in refusing a continuance of the hearing of the motion for a new trial; and (7) in overruling that motion.

The facts shown by the record are not seriously controverted and may be summarized as follows: In Logan county there is a large cattle ranch known as the Bilby Ranch. The foreman, Grady Andrews, resides at the ranch headquarters. About twelve miles

away there is a residence on the ranch where a ranch employee, Russell Curtis, and his wife lived. The cattle grazed on that part of the ranch near where Curtis lived were owned by Surratt and Purvine. The cattle had been bought in Arizona, where they had been branded with an "O" on the left shoulder and an "R O" on the left hip, and there is evidence tending to show that Surratt and Purvine had procured a certificate from the State Brand Commissioner to use this as their brand in Kansas without having to rebrand the cattle. Apparently there had been quite a little cattle stealing in several counties in that part of the state, so much so that the sheriffs had called upon the Kansas Bureau of Investigation for assistance in apprehending the thieves and recovering the stolen cattle. In response to this Lou P. Richter, director of the KBI, had sent Charles C. Maupin, one of his agents, to western Kansas to assist the local officers. On November 9, 1944, Maupin learned that the Surratt and Purvine cattle on the Bilby ranch were to be taken out of the pasture. He asked the foreman, Mr. Andrews, to leave two of them at the Curtis place on the ranch to see what would happen. All of the cattle but two were taken away, and the two were left at the Curtis place. After dark that evening Mr. Richter, Maupin, the sheriff of Logan county, and other peace officers, in three automobiles, patrolled the highway near the Curtis house and stopped at a schoolhouse. They saw a truck driving away from the Curtis place, pulled in behind it and drove along without lights for awhile. They finally turned on their headlights, also the police red lights and sirens, and started to overtake the truck, whereupon the driver of the truck speeded up in an apparent effort to outrun the car that was behind him. A shot fired by one of the officers punctured a tire on the truck and the driver had to stop. Vinyard and Herschberger were in the truck. The officers drove up by the side of the truck, Mr. Maupin got in the truck with a flashlight, found the two steers described in the information, and examined the brands.

Richter talked to Vinyard while he was still in the truck cab and asked him who these cattle belonged to. Vinyard replied: "Just some cattle I was picking up for a fellow I pastured them for." On being asked who it was, Vinyard said: "Cliff Ware." He also questioned Herschberger and Herschberger stated they were stolen cattle and that he and Vinyard had taken them from the Bilby ranch, and he expressed regret that he had been implicated in the

difficulty. Later that evening, in the presence of Maupin, the sheriff and undersheriff of Hamilton county, the undersheriff of Logan county, Tom O'Brien and the county attorney of Logan county, Richter had a talk with both Vinyard and Herschberger. Herschberger repeated his story of how they got the cattle, and Vinyard said: "Well, if that is what Ray says, that is the way it was. I took the cattle, but I didn't dispose of them." This was repeated several times during the conversation. Maupin identified the cattle, and the brands on them as being the brands used by Surratt and Purvine. He was present the next day in the city office at Oakley when Dewey Garrett, the undersheriff of Logan county, read the warrant to Vinyard and Herschberger. He was asked and answered the following questions:

"What, if anything, did Mr. Herschberger say after the warrant had been read? A. He said he was guilty.

"What, if anything, did Mr. Vinyard say? A. He said he was guilty.

"At that time did Mr. Vinyard say anything in regard to letting Herschberger go? A. He stated that he was in fault; that Herschberger didn't have anything to do with it; that he talked him into it."

On November 10, O. B. Moulden, the sheriff of Logan county, received the truck and the two steers in his official capacity as sheriff. He described the brands on them and said he took the steers to the Bilby ranch, operated by Surratt and Purvine, with Grady Andrews as foreman.

Defendant, testifying in his own behalf, said he was a farmer and lived seven or eight miles from the Bilby ranch; that he took in cattle to pasture, among which were those of Cliff Ware, with an "O—" (read O bar); that sometime before November 9, 1944, Russell Curtis came to his place and told him they had two steers of Mr. Ware's; that they were moving the cattle off the Bilby ranch and the witness was liable to lose them unless he came after them; that Curtis said he would put them up so that he could get them and that Mrs. Curtis would tell him where they were; that he went over to the Bilby ranch the next afternoon and Mrs. Curtis told him the cattle were in the barn; that he went and made arrangements with Herschberger to haul them in his truck and got back to the Bilby ranch about seven o'clock; that the cattle were in the barn; that he saw Mrs. Curtis that evening and she said the cattle were still in the barn and he and Herschberger backed up to the barn and loaded them. During his direct examination by Mr. Clark he was asked and answered the following questions:

"Did you ever steal any cattle in your lifetime? A. Not only what I am accused of this time."

On cross-examination he was asked and answered the following questions:

"Q. You have been in lots of trouble with the law, haven't you, Mr. Vinyard? A. Not no lots of trouble; no, sir.

"Q. You are on bond now, aren't you, in another case other than this one? A. Yes, sir.

"Q. That is a case down at Wichita? A. Yes.

"Q. You are charged with making moon-shine; that is right, isn't it? A. I don't know as there has been any charge made. I never heard of it no more.

"Mr. Clark: I object to that as not being proper cross-examination.

"The Court: Overruled.

"Q. And you were charged with robbing the bank at Leoti, weren't you? A. Yes, sir.

"Q. And convicted in this county, too, some years ago, weren't you? A. No, sir.

"Q. Or plead guilty to bootlegging? A. No, sir.

"Q. What county was that? A. None."

Upon the trial the facts above stated were brought out more in detail than is stated here. None of the pertinent facts to support the charge was seriously controverted.

Nothing is said in the record about the preliminary examination, since no point is made concerning it, but apparently it was held prior to November 13, the date the information was filed. Defendants were apparently held for trial in the district court and had given bond for their appearance at the next term of the district court to be held at the county seat, Russell Springs, on December 4, 1944. In the meantime defendants, on November 18, went to Scott City and employed R. D. Armstrong to represent them. He is the senior member of the firm of Armstrong & Lang and is an experienced attorney with an extended practice. Mr. Lang was county attorney of Scott county and never accepted employment on behalf of the defense to try criminal cases in nearby counties, regarding such employment as unethical, a principle which is firmly rooted among the county attorneys of this state. About November 26 Mr. Armstrong sustained an injury to a foot and leg which made it necessary for him to go to bed and be treated by a doctor for ten days or two weeks. Defendants saw him on November 30 and he informed them that he would not be able to be present in court at Russell Springs on December 4, and outlined a plan for the case to be handled. He made some effort to get another attorney to take

his place, but was unable to do so. The plan outlined was for Mr. Vinyard to plead guilty; that a motion for a new trial would be filed for him; that the motion would be set for hearing within thirty days, at the court's convenience, at which time the motion would be overruled and he would be sentenced; that this would give Vinyard time to arrange his business affairs; and that Armstrong would ask for a continuance of Herschberger's case, which he thought should be tried. It was further arranged that Mr. Lang would go to Russell Springs and present the matters in connection with what was to be done there on December 4. Mr. Armstrong wrote a letter to the county attorney of Logan county advising him of these facts. It does not appear that the trial judge was advised of these facts prior to December 4. In fact, the court had a jury called for that date, expecting these cases to be tried or otherwise disposed of. They were the only cases to be tried at that term for which a jury would be needed.

On December 4 Mr. Lang was present in court and presented first an application on behalf of Herschberger for a severance, which was granted. He then presented an application on behalf of Herschberger for a continuance because of the illness of Mr. Armstrong, which was supported by affidavits and a doctor's certificate, and this was granted and the case continued to January 22. Herschberger was arraigned and entered a plea of not guilty. The information was read to Vinyard and the court asked him how he would plead—guilty or not guilty? His answer was equivocal and the court entered a plea of not guilty for him. Mr. Lang then advised the court that he had understood Mr. Vinyard was to enter a plea of guilty and that he had come there for the purpose of assisting him in that matter, and suggested that he confer with the defendant. The court granted a recess. Afterwards the court asked him if he desired to change his plea. Vinyard replied:

"I presume that is all there is to do. As I said a minute ago, I do not know. There was part of it we were guilty, of having those cattle."

The court replied: "Unless you unqualifiedly plead guilty, the Court can't do anything but enter a plea of not guilty for you."

Vinyard replied: "I will enter a plea of guilty then. I haven't no attorney. I talked to Mr. Armstrong. I would like to have showed a few things that I can't do today."

The court let defendant's plea of not guilty stand and asked him if he was able to employ an attorney. He said he thought he was and asked if there was any other attorney present. He was advised

that Mr. Taylor, of Sharon Springs, was present. Vinyard replied that he did not know Mr. Taylor. It further developed that Vinyard had made no effort to get another attorney since he had known Mr. Armstrong could not be present. The court expressed the view that he could have gotten an attorney if he had wanted one. The court told him then he would give him until the next morning to employ an attorney of his own choosing, and if not, the court would appoint an attorney for him. Defendant then orally requested a continuance until December 29 to allow him to take care of his crops. The court declined to grant that request and continued the case over until the next day. Vinyard said he would try to get an attorney, but in any event he would be present the next morning.

The Court stated:

"I might say to the jurors, as the county attorney has requested, that you should be particularly careful not to talk with anyone or permit anyone to talk in your presence about anything connected with either of these cases about which we have been having discussion this morning. The purpose is that your minds may be free and open and that you may not be under suspicion by either the county attorney or either of the defendants, that you have prejudiced the case in any way. Don't form or express any opinion as to the facts of these cases until they shall have been submitted to you. Ordinarily an admonition of this kind is not given until the jury is selected, but due to the fact that we have jurors here somewhat under a handicap in that you have come from a long ways, a lot of you, and that there may be some discussion in your communities about this case, just do not take part in any such discussions, so that when you come here, you can say you don't know and haven't heard what purported to be the facts in this case. . . . We will simply have to wait until the jury is selected and you have heard the case."

On December 5 the case was called at 9:40 a. m., when defendant appeared without counsel. The court appointed E. M. Beougher, a reputable attorney of Gove county, to represent defendant. Mr. Beougher made an oral request that the case be continued until December 29 "on the ground that he (defendant) had some family affairs to take care of, some crops to get in and prepare for, in the event the trial does not turn out like he thinks it will." The court explained in detail the condition of the business of the court in Logan and other counties of the judicial district (the district is composed of six counties) and that if the case could not be tried then it would have to go over until late in the spring. The court observed that the state had some rights in the matter and that he did not feel justified in continuing it so long. Mr. Beougher replied: "In view of the Court's ruling, we are ready to proceed." The jury was called

and empaneled. Both the defendant and the state exercised but one peremptory challenge. The state proceeded to introduce its evidence. Only five witnesses were called and their testimony was not lengthy. At some time before noon Mr. Ray C. Sloan of Hoxie called the court by telephone and advised that he and his partner, W. H. Clark, had just been employed in the case and asked the court to continue the hearing until they could drive to Russell Springs, and stated they could be there by two o'clock. The court replied that the case had been dragging for a day and a half and that he did not feel justified in further continuing it. The new attorneys arrived shortly before two o'clock p. m. The court granted a recess for them to talk to defendant, after which the trial proceeded and was completed the same day.

Among the instructions the court gave the jury were the following:

"No. 4. You are instructed that the offense of grand larceny as charged in the information in this case consists in the taking and carrying away without the consent of the owner or owners thereof, of two coming two-year-old white face steers, weighing about 700 pounds and branded with the letter 'O' on the left shoulder, and the letters 'RO' on the left hip, with the intent to deprive the owner or owners of their ownership therein. The essential elements of the offense as charged are as follows:

"(1) There must be a taking and carrying away of one or more of the steers above described in Logan County, Kansas;

"(2) Such steer or steers must have been owned by Fred Surratt and Carroll Purvine;

"(3) The defendant must have taken said steer or steers without the consent of the owners;

"(4) The defendant must have taken said steer or steers with the intent to permanently deprive the owner thereof;

"(5) The offense must have been committed by the defendant in Logan County, Kansas, at some time within 2 years prior to the filing of the information in this case, to-wit, on November 13, 1944.

"No. 6. If you find from the evidence that the defendant through mistake, oversight, or carelessness, took the steer or steers, as charged in the information, without the intent of depriving the owner permanently thereof, then you should find the defendant not guilty, even though said property was taken without the consent of the owner. In other words, before you can find the defendant guilty of the offense of grand larceny, as charged in this action, you must find from the evidence beyond a reasonable doubt that each and all of the elements of said offense, herein described in Instruction No. 4, exist.

"No. 7. The term 'unlawfully' as used in these instructions means without lawful justification or excuse.

"The term 'feloniously' as used in these instructions means that felonious intent which has been defined as the intent to deprive the owner not only

temporarily, but permanently of his property, without color or right or excuse for the act, and to convert it to the taker's use without the consent of the owner."

No objection was made to the instructions given. After the instructions were read to the jury counsel for defendant requested the court to give the following instruction:

"In this case the defendant has testified that he took the cattle in question at the direction and under the instruction of one Curtis, an employee of the complaining witnesses.

"You are instructed that if you find that said defendant did so take said steers in compliance with the instruction and direction of an employee of the owner, with a bona fide belief on the part of defendant that said employee was acting under authority of his employment, that the felonious intent on the part of defendant is lacking and you should find defendant not guilty."

The request was refused and the court made the following notation thereon:

"Submitted after jury instructed. Matters mentioned are covered by instructions given."

Defendant filed a motion for a new trial, which was set for hearing December 19. On December 16 counsel for defendant had a subpoena issued out of the district court of Logan county for Russell Curtis and his wife and Tom O'Brien, on which the sheriff made a return that none of them could be found in his county. Upon the hearing of the motion for a new trial there was testimony to the effect that Curtis and his wife had skipped out on November 10, the day after the cattle were stolen, and had not since been located. O'Brien lived at Canadian, Texas. Defendant asked for a continuance of the hearing of the motion for a new trial. This was refused. The motion for a new trial was overruled, and this appeal followed.

We now take up the questions argued here. Appellant first contends that defendant was not tried by an impartial and unprejudiced jury. The fact that this was not set forth as one of the grounds of the motion for a new trial indicates that it was an afterthought. However, the question was argued at the hearing of the motion for a new trial. The argument is that on the first day of court the proceedings previously set out herein were conducted in the hearing of a number of the members of the jury panel and that the jurors present must have heard defendant's qualified plea and the colloquy between the court and the defendant and between the court and counsel. This contention rests upon suspicion rather than

proof. No member of the jury panel was called to testify by affidavit or otherwise that he had heard any of the proceedings. It seems clear, however, that some of the members of the jury panel were in the courtroom during the proceedings, or a part of them. They were "coming and going." The record also discloses that the colloquy between counsel and the court was conducted at the court's bench inside the rail, which would indicate that it was unlikely that jurors out in the room heard any of it. The court reporter took the examination of the jurors on their voir dire. A summary of the examination of four of them is set out in the abstract. Two of these knew the defendant; the other two did not. None of them had heard from anyone what purported to be the facts in the case, and none of them had formed any opinion as to the guilt or innocence of defendant. Each of them stated that he could try the case fairly and impartially from the evidence produced at the trial. Appellant cites *State v. Stewart*, 85 Kan. 404, 116 Pac. 489, and *State v. Van Wormer*, 103 Kan. 309, 325, 173 Pac. 1076, 180 Pac. 450, upon the determination of the juror's mind as pertaining to his qualifications to sit as a juror. There is nothing in this record to show a violation of the rules stated in those authorities. The theoretical matter herein complained of does not appear to have been brought out on the voir dire examination. On this point see *State v. Lovell*, 140 Kan. 7, 34 P. 2d 578. Counsel place some stress on the fact that the court gave the admonition to the jury hereinbefore mentioned. It is a common practice for trial courts to give such an admonition to the members of the jury panel present before any of the jury cases to be tried are actually called for trial. The giving of such an admonition cannot be said to be detrimental to a defendant later tried. (See *State v. Pearce*, 87 Kan. 457, 461, 124 Pac. 814.)

Appellant next contends that the court erred in having defendant arraigned in the absence of his attorney and refusing to grant a continuance. This appears also to have been an afterthought. Answering an inquiry by the court, Mr. Lang stated that Mr. Armstrong represented both defendants. Being unable to be present personally he had outlined with the defendants on November 30 the plan of handling the cases at the session of court on December 4 and that Mr. Lang would be present to look after that procedure for the defendants in lieu of Mr. Armstrong. This plan he had communicated to the county attorney. Defendant made no ob-

jection to Lang appearing for those purposes in lieu of Mr. Armstrong. Defendant was in fact represented by an attorney and did not contend otherwise. He chose not to follow in full the advice of his attorney, or to carry out the plan his attorney had outlined, and the court properly entered a plea of not guilty for him. This was advantageous rather than detrimental to the defendant.

The only thing in the way of an application for continuance was an oral request of the defendant made on December 4 and an oral request made by his attorney the next day that he have more time in order to take care of his crops and look after some family affairs. This is not a valid reason for continuance. (See G. S. 1935, 62-1414 and 60-2934, and the cases annotated under them.) If the court were compelled to grant a continuance in a criminal case for reasons of that character few, if any, defendants would ever be tried.

It is next argued that the court erred in failing to give an instruction on unrelated crimes. We have hereinbefore set out in full the questions propounded by the county attorney and the answers given by defendant covering that matter. Present counsel were then in charge of defendant's trial. No objection was made to any of the questions upon the ground that they were unrelated crimes, hence counsel are not in good position now to complain about it. They made no request for an instruction on the subject. While generally it may be said that in all criminal cases where evidence is brought out pertaining to offenses which may have been committed by defendant and which are unrelated to the one on trial, it is proper for the trial court to give an instruction pertaining to such evidence; but where, as here, the evidence pertaining to the crime for which defendant was being tried is so clear, and there was no valid objection to the few questions pertaining to unrelated crimes, and no request for an instruction on that subject, we think it clear that the failure of the court to give such instruction cannot be regarded as erroneous.

Counsel for appellant state "the court erred in interlocking instructions No. 6 and No. 4 to the extent that instruction No. 6 is made meaningless and both are confused." This thought is not elaborated in the brief. Apparently it is the view of appellant's counsel that the reading of the instructions showed them to be confused and that No. 6 is made meaningless. We are unable to reach that conclusion by a reading of the instructions. No. 4 sets out

the various elements of the offense which the state must prove beyond a reasonable doubt, which term is elsewhere defined in the instructions. It is fully as favorable to defendant as he was entitled to receive. Instruction No. 5, not quoted specifically, told the jury that if they were unable to find without reasonable doubt each of the elements set forth in instruction No. 4 they should find the defendant not guilty. No. 6 relieves defendant from liability if he took the steers "through mistake, oversight or carelessness" and is favorable to defendant. We are unable to see any error in instructions Nos. 4 and 6 of which the appellant can complain.

It is next contended that the court erred in refusing to give the instruction requested. This was predicated upon the view that Curtis, an employee of the ranch, had told defendant to come to the ranch and get two steers which belonged to Surratt and Purvine. There is no testimony in the record that would justify such an instruction. Defendant's testimony was that Curtis told him that two of the steers defendant had been pasturing for Cliff Ware were at the ranch and that defendant had better come and get them or they would be lost. Quite clearly the jury did not believe defendant with respect to that testimony, nor did they believe that he thought he was getting two steers which belonged to Cliff Ware which he had taken in to pasture. Any slight examination of the brands on the steers would have informed defendant that the steers were not those which belonged to Ware and which he was pasturing. The court properly held the instructions given fully covered the matters presented by the evidence.

It is argued the court erred in refusing to continue the hearing of the motion for a new trial. This was set for hearing on December 19. Three days prior thereto, as previously noted herein, defendant caused a subpoena to be issued for Russell Curtis and his wife and Tom O'Brien, which had been returned by the sheriff of Logan county with the report that none of them could be found in his county. In appellant's brief it is said they did not want O'Brien as a witness, but wanted to get in contact with him, thinking that from him they could learn where Curtis and his wife were. The evidence on the hearing of the motion for a new trial disclosed that Curtis and his wife had left the country immediately after the arrest of defendant and had not been located. So, the getting out of a subpoena for these witnesses was a mere gesture. There is nothing to indicate that appellant or his counsel thought they could be served.

There is a suggestion that Curtis was a party to the theft of the steers for which defendant was convicted and that officers had been looking for him, without success. It is not stated what defendant thought he might be able to prove by Curtis or his wife. No affidavit setting forth the evidence they would be expected to give was filed, nor was any statement made of it. There was no showing, nor was there any claim, that they could be located and their testimony presented at any reasonable time in the future. We think it clear there was no error in refusing to continue the motion for a new trial in order that those witnesses might be procured.

It is argued that the court erred in overruling the motion for a new trial. Under this head the matters previously discussed here are argued, but they need no further attention. Also it is argued that there was no evidence that Surratt and Purvine owned the steers that were stolen. That contention is inaccurate. Andrews, the foreman of the ranch, testified positively that the steers belonged to Surratt and Purvine. Maupin gave similar testimony, but his judgment was based upon the brands, and is criticized for that reason. The criticism is without substantial basis. The purpose of branding cattle is to identify their ownership.

We find nothing meritorious in any of the points argued here on behalf of the appellant. On the other hand, we think the record shows that defendant had a fair trial and that he was justly convicted. The judgment of the court below is affirmed.