No. 38,753

STATE OF KANSAS, *Appellant*, v. A. J. FRY, *Appellee*
(249 P. 2d 929)

Opinion filed November 10, 1952.

*David W. Kester,* county attorney, of Eureka, argued the cause, and *Harold R. Fatzer,* attorney general, and *Warden L. Noe,* special assistant attorney general, both of Topeka, were with him on the briefs for the appellant.

*Thos. C. Forbes,* of Eureka, argued the cause, and *George S. Reynolds* and *Harold G. Forbes,* both of Eureka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was a prosecution for the larceny of neat cattle. On February 20, 1952, the county attorney of Greenwood county duly executed and filed in the district court of that county an amended information which charged "that on or about the 11th day of December, 1950, in the county of Greenwood and state of Kansas, A. J. Fry did then and there unlawfully, feloniously and willfully, take, steal, carry away certain personal property, to wit: two white-

faced heifer calves with a V notch commonly called a 'swallow-fork' cut out of the end of the left ear, that neither of said calves had any hot-iron or acid brand upon them, said calves being of the approximate value of $218.88, said personal property belonging to and being the property of Tom Ulrich and Clark Ulrich, and being contrary to the provisions of 21-533 G. S. of Kansas 1949, and contrary to the form of the statutes in such case made and provided and against the peace and dignity of the state of Kansas." On the same day the case was called for trial. Defendant waived arraignment, entered a plea of not guilty, and a jury was duly impaneled and sworn to try the case. The state's evidence was introduced on that day and the next. At the close of the state's evidence counsel for the defendant moved that the court direct the jury to return a verdict of not guilty and that defendant be discharged at the cost of the state. After argument the court sustained the motion. The state duly reserved the question as to whether the court was correct or erred in sustaining the motion. The court prepared a verdict and directed the jury to retire to the jury room and elect a foreman, and that the foreman should sign the verdict prepared by the court. A verdict of not guilty in due form was returned by the jury. Counsel for the state again reserved the question as to whether the court was correct or erred in sustaining the motion of defendant for a directed verdict and dictated into the record a motion that the court set aside the verdict rendered by the jury and proceed with the trial of the cause, which motion was overruled. The court discharged the jury from further consideration of the case; also discharged the defendant and taxed the costs of the action to the state. The state perfected its appeal, which has been duly presented to this court on abstract, briefs and oral argument.

The pertinent facts shown by the state's evidence may be summarized as follows: At the time of the alleged offense A. J. Fry was living in Hamilton, a small town in Greenwood county. He owned a described half section of land about two miles southeast of Hamilton, a part of which was used for the growing of wheat and the remainder was used for pasture. Near the edge of the wheat field was some timber in which he had pens for handling or loading cattle. Fry rented this land to his son-in-law, Harold Creasser, who lived on the place and handled some cattle. Fry also handled a few cattle on the place. Adjoining the Fry land on the south was a half section of land owned by A. J. Fry's son. Ap-

parently it was a pasture country where many cattle were grazed owned by the landowners or shipped in for grazing. Tom and Clark Ulrich are brothers. They were in the cattle business in what may be said to be a large way. They operated on about 40,000 acres, some of which they owned and much of which they leased. They handled 8,000 to 10,000 cattle, of which 300 to 500 were their own and the remainder they took in for grazing in the pasture season. The land upon which they operated entirely surrounded the section of land owned by A. J. Fry and his son. In the fall of 1950 Ulrich brothers bought nine calves from Ross Hampton of Fort Worth, Texas, for whom they grazed cattle that summer which they shipped to market in the fall. These nine calves were thought to be pretty young to ship and he sold them to the Ulrich brothers. These calves were all marked with a V notch, commonly called a "swallow-fork" cut out of the end of the left ear. This was a mark used by Ross Hampton to identify calves. After putting these calves in the weaning pen until they were weaned Ulrich brothers turned them out with other calves in the pasture adjoining the A. J. Fry half section. They had other calves there which they had weaned from their own cows. A. J. Fry and his son-in-law had calves on the Fry place. The next spring when the Ulrich brothers were branding and dehorning their calves they observed that they were short two of the nine calves they had bought from Ross Hampton.

In the meantime, in the fall of 1950, there were twenty or more calves on the A. J. Fry half section. At that time there was a man by the name of Grover Prewitt who lived about five miles south of Cassoday in Greenwood county, about 35 miles from Hamilton, who was in the cattle business, handling about 2,000 head, perhaps 200 of which he owned, and the remainder he pastured for others. He had known A. J. Fry since 1947 and was frequently in Hamilton. One day early in December, 1950, he met Fry, who told him that he had some calves for sale. Prewitt said he wanted to buy calves and planned to go to see the calves Fry wanted to sell, which he did a few days later. The calves were on the Fry half section. Fry was there. He and Prewitt looked over the calves and Prewitt agreed to buy them at 32 cents a pound, the calves to be weighed at Hamilton. A few days later, or about the 11th of December, Prewitt took his truck to the Fry place. Fry was there, the calves were loaded, and taken to Hamilton, where they were weighed together. Fry was present when they were

weighed. The average weight of the calves was about 325 pounds, although some were heavier than others. Prewitt paid Fry $2,118.48, being the price agreed upon, and Prewitt took the calves to his place near Cassoday and branded them with his brand P-L on the left shoulder. Mr. Fry was at the pen when the calves were loaded, at the scales when they were weighed, and received the money for them. He knew two of the calves he sold to Prewitt did not belong to him.

In the fall of 1951, two state brand inspectors, Wesley Wise and George Gutsch, together with J. G. French, sheriff of the county, were examining various herds of cattle for strays. They talked to Mr. Fry, who told them he had sold two calves which did not belong to him to Mr. Prewitt. That is the only way they knew these calves were at Prewitt's place near Cassoday. They went to the Prewitt place the morning of November 1, 1951. Mr. Prewitt's son got on a horse and drove the cattle up to the pen where there was a chute, where they were examined by the brand inspectors for earmarks and brands to try to find the ownership of the stray cattle. They found Mr. Prewitt's brand and found two heifers that had "Swallow-Fork" in the left ear. They went back to Hamilton and saw a number of young cattle in the Ulrich pasture which had similar earmarks. In the afternoon the brand inspectors and Tom and Clark Ulrich went to the Prewitt place and again examined the heifers and identified the two which had the Swallow-Fork cut in the left ear as being the two which Tom Ulrich had missed when he branded and dehorned his cattle in the spring of that year. That evening they went to the county attorney's office where they found the county attorney and Mr. A. J. Fry, and a statement was taken from Fry. The county attorney told him that he had the right to be represented by counsel. He was asked if he wanted someone to represent him and he said he didn't need an attorney and that he would give a statement. The persons present at that time, in addition to Mr. Fry and the typist who took the statement on the typewriter in question and answer form, were the state brand inspectors, Wise and Gutsch, Mr. French, the sheriff, Eddie May, the under-sheriff, and the county attorney. This statement reads:

"Q. What is your name? A. A. J. Fry.

"Q. Where do you live, Mr. Fry? A. Section 6-12-25; 5 miles S. Hamilton and 2½ miles East.

"Q. How long have you lived in that locality. A. I believe I got possession in the middle of July, this year.

"Q. Where did you live before that? A. Lived at Hamilton three years.

"Q. Do you have a son-in-law living near Hamilton? A. Yes.

"Q. What is his name? A. Harold Creasser.

"Q. Does he rent this farm from you, or in partners? A. Rents.

"Q. Is he engaged in cattle business on the farm? A. Yes.

"Q. Do you have cattle in the same pasture with him? A. I have a few head.

"Q. Did you have knowledge of a stray in the pasture? A. Yes.

"Q. What description? A. White-faced steer, weighed about 600 pounds.

"Q. What conversation did you and your son-in-law have in regard to the stray steer—in regard to agreement, etc.? A. He told me one was in there, and as far as that's concerned, I myself saw it there. There was an agreement between the two of us that we would take it to slaughter and divide the meat.

"Q. When was the final agreement to take the steer to Olpe, Ks., to slaughter? A. I told him any time he was ready, I was, and left the job of taking the steer to Olpe up to him.

"Q. If the son-in-law had been unable to take the steer to Olpe, Ks., would you have taken him? A. I just don't know.

"Q. If he wouldn't have, would you? A. I suppose so, yes.

"Q. Did you advise your son-in-law, or encourage him, in taking the steer to slaughter and then dividing the meat? A. I wouldn't say yes, kind of 50-50 deal. I didn't advise him what to do—sort of a mutual agreement.

"Q. You didn't at any time try to discourage him or try to talk him out of the deal? A. I guess not.

"Q. Did you know at the time that the animal was a stray—that it didn't belong to you or your son-in-law? A. Yes.

"Q. Did you realize that if you took the steer to slaughter that you would be committing a crime? A. I hadn't given it a thought.

"Q. Do you know that stealing cattle is a crime? A. Yes.

"Q. Did you stop to think what would happen to you if you were to be caught taking the steer to slaughter? A. No, I did not.

"Q. Do you think you were justified in taking the stray steer to Olpe, Ks., to be slaughtered? A. The way I feel about it, I would say yes."

This statement was offered in evidence. The court declined to admit that portion of it previously quoted. The following portion of the statement was admitted in evidence:

"Q. Have you ever had any other strays in your possession? A. Yes.

"Q. Did you report these strays to any official person? A. No, I did not.

"Q. What did you do with these strays? A. I sold them in with a bunch of calves to Grover Prewitt, Cassoday, Kansas.

"Q. How many calves were in the bunch you sold to Prewitt at the time you sold the two strays? A. Twenty.

"Q. When did you make this sale to Prewitt? A. It runs awfully close to the 1st of December last year, I can't remember the exact date.

"Q. How much did they weigh, i. e., the strays? A. I don't know for they were all weighed together.

"Q. When did you get these strays? A. Possibly two or three months before I sold them.

"Q. What kind of stuff were they? A. I would say they were white-faced heifers.

"Q. How old were they? A. I don't know. But they were under yearlings.

"Q. Did they have any identification marks on them? A. It is possible that there were, but I didn't see any.

"Q. Into what pasture did they come? A. Into the north pasture where I keep my cattle.

"Q. Were there any cattle in the adjoining pastures? A. Yes. Ulrichs' in the west, my son-in-law's on the south, and I don't know whether there were any on the east at that time.

"Q. What did Grover Prewitt do with them? A. I couldn't tell you.

"Q. Did you make any inquiries of your neighbors concerning this stuff? A. No. Not on these two.

"Q. Did any neighbors make any inquiry of you concerning them? A. No.

"Q. Do you have any strays in your possession at this time? A. I don't know as I haven't checked since Sunday.

"Q. Did you have any strays in your possession on Sunday, October 28, 1951? A. Yes.

"Q. How many? A. One.

"Q. How long have you had it? A. Three or four months, I can't tell you exactly.

"Q. What kind is it? A. White-faced heifer.

"Q. Where is it? A. In the north pasture.

"Q. Did you try to find the owner? A. I have not.

"Q. Does it have any brand marks, or marks of identification? A. I haven't seen any.

"Q. Have you looked for any? A. No. I get reasonably close to her, I haven't seen any marks.

"Q. Do you have any idea to whom it belongs? A. I do not.

"I have read the above and foregoing answers and questions. I made them freely and voluntarily and I know they are true.

"s/ A. J. Fry.

"Signed and dated this 1st day of November, 1951."

In this court we are confronted with the contention of counsel for appellee that the appeal should be dismissed as being moot for the reason that defendant has been discharged and an attempt to try him again would put him in double jeopardy, citing *State v. Aurell,* 112 Kan. 821, 212 Pac. 899. The point is not well taken. In *City of Wichita v. Stevens,* 167 Kan. 408, 207 P. 2d 386, where the statute involved is substantially like the third provision of G. S. 1949, 62-1703, it was held that an appeal by the city on a question of law properly reserved will be reviewed by this court for authoritative determination, citing *State v. Reed,* 145 Kan. 459, 65 P. 2d 1083. Perhaps there are other reasons why the point is not well taken. See, *State v. Arnold,* 142 Kan. 589, 50 P. 2d 981, and *State v. Simpson,* 169 Kan.

527, 220 P. 2d 175. We desire to make clear, however, that the question of double jeopardy is not now before us and what we have said is simply in answer to the point urged by counsel for appellee.

The evidence further disclosed that when defendant discovered the two calves in question were on his premises with his calves he did not report them to the sheriff as strays as required by G. S. 1949, 47-230. The section of our statute last mentioned, and others in the same chapter, make full provision for the reporting and handling of stray cattle. We have had statutes of similar character since the organization of our state. (See, Chap. 83, Laws of 1861, and subsequent compilations of our General Statutes.)

The real question before us is whether the court erred in taking the case from the jury at the close of the State's evidence. In *State v. Vinyard*, 160 Kan. 66, 159 P. 2d 493, where defendant had been found guilty of the larceny of certain cattle, this court approved an instruction of the trial court (p. 72) of the essential elements of the offense charged in the information, which paraphrased so as to apply to the county and the name of the owners of the cattle reads as follows: (1) There must be a taking and carrying away of one or more of the calves described in Greenwood county. (2) Such calves must have been owned by Ulrich brothers. (3) The defendant must have taken the calves without the consent of the owners. (4) The defendant must have taken the calves with the intent to permanently deprive the owners thereof. (5) The offense must have been committed by defendant in Greenwood county at sometime within two years prior to the filing of the information in this case.

Counsel for the state contend that every element of the offense stated in the Vinyard case necessary to a finding of guilt was shown by the evidence in this case. We are inclined to agree with that contention. The offense was charged to have been committed in Greenwood county within two years prior to the filing of the information. There was positive evidence that the calves belonged to the Ulrich brothers. It seems quite clearly established that defendant sold the calves as his own to Grover Prewitt and accepted the money for them and that at the time he made the sale he knew the calves did not belong to him.

Counsel for appellee point out that there is no showing in the evidence of the State of how defendant got possession of the calves, or that at the time he took possession of them he intended to con-

vert them to his own use. It is true that the State's evidence does not disclose that defendant drove them onto his place from the Ulrich pasture, or whether the calves got into his pasture in some other way; nor does it show the particular time when defendant concluded to sell them and deprive the owners permanently of the calves. Under the evidence we think that time was not later than the time defendant sold the calves to Prewitt as his own. We think it not important that the State was not able to show the intent to dispose of the calves as his own at some particular date prior to the time he did so. There is some evidence, however, that the jury might have construed as showing an earlier date, namely, when defendant first found them as strays on his place, for the reason that defendant made no effort to comply with the law pertaining to strays at that time. As bearing upon this question of the time defendant formed the intention to treat the calves as his own and deprive the rightful owners of them, counsel for the state complain of the ruling of the court in refusing the first part of the written statement made by Fry. Counsel for appellee contend the state did not reserve the question of the refusal of the court to admit the first of Fry's statement. Without debating whether the reservation went specifically to that question, since the case must be tried again, we think the matter should be treated. The part of Fry's statement which the court did not admit in evidence showed the disposition of Fry and his son-in-law as to another stray which came upon his place. That was not reported to the sheriff and Fry and his son-in-law, by a mutual agreement, had it butchered and used the meat. In other words, they converted it to their own use. It has some bearing upon Mr. Fry's plan and method of disposing of strays which came upon his premises, namely, to convert them to his own use. (See, *State v. Robinson*, 125 Kan. 365, 263 Pac. 1081.) We think there is evidence in the record that would have justified the jury in finding that when defendant first saw the calves in question on his premises he had the purpose and intent of eventually disposing of them as his own property, if the opportunity later arose for him to do so.

When a case is tried to the court and jury it is the function of the jury to weigh the evidence and find the facts. That is not the function of the trial court. In this case we think the court was not justified in holding, as a matter of law, that the facts proved by the state would not sustain a verdict of guilty.

We have examined all the authorities cited by counsel on both sides and many more. We find it unnecessary to unduly extend this opinion by setting them out and commenting upon them.

The state's appeal on the questions reserved is sustained.